IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-110

No. 501A20

Filed 24 September 2021

IN THE MATTER OF: L.H., I.H.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 26 August 2020 by Judge Burford A. Cherry in District Court, Catawba County. This matter was calendared for argument in the Supreme Court on 19 August 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Marcus P. Almond for petitioner-appellee Catawba County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Jeffrey William Gillette for respondent-appellant mother.*

EARLS, Justice.

¶ 1   Respondent-mother appeals from the trial court's order terminating her parental rights to her minor daughters, L.H. (Lucy) and I.H. (Ingrid).[1] We affirm.

## I.   Background

¶ 2   The record shows that Catawba County Department of Social Services (DSS) has a long history of involvement with respondent and her children. DSS filed a

---

[1] Pseudonyms are used to protect the identity of the juveniles, as well as their minor sibling mentioned in this opinion, and for ease of reading.

juvenile petition regarding one-month-old Lucy and three of her older siblings in December 2005 and then filed a second petition and obtained nonsecure custody of the children in January 2006.[2] Following a hearing on the petitions conducted over the course of February, March, and April 2006, the trial court entered an order on 7 June 2006 that adjudicated Lucy and her siblings neglected juveniles and granted DSS custody of the juveniles. The adjudication was based on findings that the children's biological father, from whom respondent was divorced, had twice been convicted of indecent liberties, once for conduct involving two of his sisters and once for conduct involving another juvenile family member; had engaged in inappropriate sexual contact with his oldest daughter; and posed a significant risk of further sexual abuse. The court further found that respondent was aware of the father's convictions but did little to protect the children, did not believe the children were at risk, and refused to agree to prevent the father from further contact with Lucy. Respondent allowed the children to visit the paternal grandmother's home despite a history of inappropriate sexual conduct in the family, left the children in the supervision of an individual who was involved in an active Child Protective Services (CPS) investigation, and lived with the children in an unsafe environment. With the father in prison, respondent made significant progress on her case plan by the time the matter came on for a review hearing on 27 June 2006, and the children had been

---

[2] Lucy was born in November 2005. Ingrid was born in December 2007.

returned to her care. In the order entered after the review hearing, the trial court returned custody of the children to respondent.

¶ 3    Nine years later, on 3 November 2015, DSS filed a juvenile petition alleging that nine-year-old Lucy, seven-year-old Ingrid, and their fifteen-year-old sister Sarah were neglected juveniles and obtained nonsecure custody of the children. Following a hearing in February 2016, the trial court entered an order on 1 March 2016 that adjudicated the children neglected juveniles based on the following findings: that respondent and the children were residing with an individual, Charles Fleming, who had previously been charged with felony indecent liberties with a child and convicted of assault on a child and had been separately convicted of misdemeanor contributing to the delinquency of a juvenile; that respondent refused to sign an agreement specifying there would be no unsupervised contact between Mr. Fleming and the children and continued to live with Mr. Fleming and leave the children in his care unsupervised; that respondent admitted to a social worker that Sarah had been sleeping in the same bed with Mr. Fleming; and that, despite the parties' denials, evidence indicated a sexual relationship existed between Sarah and Mr. Fleming. The trial court granted custody of the children to DSS. Respondent cooperated with services offered by DSS, and the matter came on for regular review and permanency-planning hearings until the trial court returned Lucy and Ingrid to respondent's custody by order entered 22 May 2018.

On 18 March 2019, DSS filed the most recent juvenile petition alleging thirteen-year-old Lucy and eleven-year-old Ingrid were abused and neglected juveniles and obtained nonsecure custody of the children. The petition alleged that respondent's boyfriend, Johnny Gortney, who was also a caretaker for the children, had inappropriately touched Ingrid "both over and under her clothes on her 'boobs' and genital area, using his hands and fingers[,]" on more than one occasion between August and December 2018; and he had inappropriately touched Lucy "over her clothes on her 'boobs' with his hand" on more than one occasion in November 2018. Following a hearing on 22 April 2019, the trial court entered an order on 23 May 2019 that adjudicated Lucy and Ingrid abused and neglected juveniles based on findings that were consistent with the allegations in the petition. The trial court ordered that DSS retain custody of the children and that respondent comply with a case plan with requirements to complete an updated psychological evaluation, a parenting assessment, a non-offending parenting program, individual counseling, and therapy with the children. The court allowed respondent weekly supervised visitation with the children but ordered Mr. Gortney not to have contact with the children.

In an order entered on 29 August 2019 following a 29 July 2019 permanency-planning hearing, the trial court set the primary permanent plan for the children as reunification and the secondary plan as adoption. The court's findings indicated respondent was availing herself of services, but the court expressed concern that

respondent had not proven capable of protecting the children from sexual abuse by members of their household despite CPS's long history of involvement with the family and the extensive services provided. The court specifically identified respondent's failure to demonstrate that she could keep her children safe from risk as a barrier to reunification.

¶ 6        Following the next permanency-planning hearing on 21 October 2019, the trial court entered an order on 22 November 2019 that changed the primary permanent plan for the children to adoption with a concurrent secondary plan of reunification and guardianship. The change in the permanent plan was based, in part, on the results of respondent's psychological evaluation reassessment, which indicated "the combination of [respondent's] mental health and cognitive limitations result[ed] in her inability to effectively and safely parent and protect her children" and that "it [was] not likely that any service provided to [respondent] could significantly alter her inability to parent and protect her children." The court further found the results were validated by its own history with and observation of respondent. Specifically, the court found a clear pattern had emerged, whereby the children were exposed to men with histories of committing sexual offenses and were sexually abused; then the children were removed from the home, respondent participated in services and demonstrated some improvement, and the children were returned to respondent's care for the cycle of abuse to be repeated. The court also found that respondent

disbelieved the sexual abuse even occurred and believed the abusers over her children.

¶ 7        On 27 November 2019, DSS filed a motion in the cause to terminate respondent's parental rights in Lucy and Ingrid on the grounds of neglect, willfully leaving the children in a placement outside the home for more than twelve months without a showing of reasonable progress, and dependency. *See* N.C.G.S. § 7B-1111(a)(1)–(2), (6) (2019). Respondent filed a reply denying that grounds existed to terminate her parental rights. A termination hearing began on 2 June 2020 and continued on 1, 14, and 15 July 2020.[3] The trial court entered an order on 26 August 2020 that adjudicated the existence of all three grounds for termination alleged in the motion, concluded termination of respondent's parental rights was in Lucy's and Ingrid's best interests, and terminated respondent's parental rights in both children. Respondent appeals.

## II.    Analysis

¶ 8        Respondent challenges the trial court's adjudication of the existence of grounds to terminate her parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (6).

¶ 9        "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In*

---

[3] The matter was also before the trial court on 9 July 2020 for a hearing on a motion to quash a subpoena requiring the children to testify during the dispositional stage of the termination hearing. Only the motion was considered on 9 July 2020.

*re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2017)). This Court reviews a trial court's adjudication of grounds for termination "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984) (citing *In re Moore*, 306 N.C. 394, 404 (1982)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* "The trial court's conclusions of law are reviewed de novo." *In re M.C.*, 374 N.C. 882, 886 (2020).

¶ 10      A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is statutorily defined, in pertinent part, as one "whose

parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). As we have recently explained:

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up).

In the instant case, the trial court issued findings detailing DSS's long history of involvement with the family and Lucy's and Ingrid's prior adjudications as neglected juveniles. The court also issued findings regarding the services offered to respondent throughout DSS's involvement and respondent's cooperation with those services. The court ultimately determined there was a substantial likelihood that the children would again be neglected if returned to respondent's care based on findings that, despite her cooperation with services, respondent failed to take any responsibility for her role in the abuse and neglect of the children, continued to disbelieve the children were abused and neglected, and failed to demonstrate the ability to protect her children.

Respondent does not contest that Lucy and Ingrid were previously adjudicated

neglected juveniles. Instead, while acknowledging that "the [trial] court made many findings of fact that could, conceivably, bear on the likelihood of future neglect," she nevertheless contends the trial court's findings failed to establish there was current neglect or a likelihood of future neglect.

To understand the robust factual basis for the trial court's ruling on this ground, it is useful to review the findings relevant to its adjudication of neglect, which are as follows:

> 5. On or about April 17, 2006, the minor child [Lucy] and her three older siblings were adjudicated neglected, based in part on the refusal of [respondent] to protect the children from contact with their biological father who was convicted in 1986 for taking indecent liberties with two of his sisters, was convicted in 2006 of taking indecent liberties with his sixteen-year-old female relative and who had also engaged in inappropriate sexual contact with the couple's oldest daughter. . . .
>
> 6. On February 1, 2016, the minor children [Lucy] and [Ingrid], as well as their older sister [Sarah] were adjudicated neglected. This time the adjudication was based in part on [respondent] leaving her children in the care of Charles Fleming and allowing her then sixteen-year-old daughter [Sarah] to sleep in the same bed with Mr. Fleming, who was an adult. After [DSS] warned [respondent] of their concerns related to Mr. Fleming's prior charge [of] Indecent Liberties with a Minor which resulted in a conviction of Assault on a Child under 12, [respondent] refused to sign a safety plan prohibiting Mr. Fleming's unsupervised contact with her children, and she continued to leave the children in his care.
>
> 7. On April 22, 2019, [Lucy] and [Ingrid] were adjudicated abused and neglected and once again placed in the custody

of [DSS], after their mother's boyfriend Johnny Gortney touched [Ingrid] on more than one occasion on her "boobs" and genital area and touched [Lucy] on her "boobs." . .

. . . .

9. Over the course of the family's involvement with [DSS], [respondent] has been offered a variety of services to improve her parenting skills and assist her in developing an ability to protect her children from abuse and neglect. While the children were in foster care during 2006, these services included but were not limited to completion of the Nonoffending Parents' Group (education and therapy group for parents of children who have been abused), individual therapy, and GED classes. After the children were removed in 2015, these services included psychological evaluation, Darkness to Light (education program related to the prevention of child sexual abuse), individual therapy, one-on-one parenting instruction, and in-home family therapy. Since the children's most recent removal, these services have included but are not limited to updated psychological evaluation, individual therapy, one-on-one review of Nonoffending Parents Group materials.

10. Each time that the children have been in foster care, [respondent] has been cooperative with services offered by [DSS].

11. Dr. Jennifer Cappelletty, clinical psychologist, has evaluated [respondent] on three occasions, May 16, 2016, November 10, 2017 and September 29, 2019.

12. During the first evaluation on May 16, 2016, [respondent] reported to the psychologist that she did not believe that her late husband had committed the sexual offenses that resulted in his felony convictions and incarceration, reporting that he only confessed so that she wouldn't lose all of her children. When questioned about whether she believed that her husband had abused her daughter, as adjudicated by the [c]ourt, she stated she did

not know because she did not see it. Such statements are consistent with [respondent's] statements during her testimony during these proceedings.

13. [Respondent] has a full[-]scale IQ of approximately 63, placing her in the extremely low range for intellectual abilities. As a result, [respondent] has an extremely limited general fund of knowledge, poor abstract reasoning skills, and an elementary vocabulary. She tends to think in very concrete terms, such that once she is taught something, she may be able to repeat the skill or phrases[ ] but has difficulty . . . apply[ing] her learning to new circumstances and decisions. She has been diagnosed with Intellectual Disability, Mild.

14. Psychological testing with [respondent] was limited by her cognitive difficulties; however, Dr. Cappelletty noted dependent personality characteristics, such that [respondent] has a pervasive need to be taken care of, she is dependent on others when making decisions, and she tends to go from one relationship to another. Dr. Cappelletty testified and the [c]ourt finds that [respondent's] cognitive limitations coupled with her dependent personality tends to hinder her judgment when making decisions about her relationships and how those relationships may impact her children.

15. When [respondent] is confronted with facts that contradict her beliefs, such as her beliefs about her husband's, Mr. Fleming's or Mr. Gortney's threat to her children, she tends to become defensive and to reject evidence of such a threat. Her typical stance on any of these issues tends to be that she does not believe any abuse occurred (or she doesn't know) because she did not see it. She accepts only minimal responsibility for the repeated removals of her children from her care. Such reactions, observed by Dr. Cappelletty during all three of her evaluations, are consistent with the behaviors and statements observed by this [c]ourt during these proceedings.

16. Intellectual limitation, such as that exhibited by [respondent] is highly unlikely to change, and this limitation is further complicated by [respondent's] dependent personality structure, which is also unlikely to change without long-term treatment. [Respondent] would have difficulty benefitting from such treatment due to her cognitive limitations.

17. Over the course of the [c]ourt's involvement with the family, [respondent] has learned to articulate some basic concrete tasks of parenting, such as the need to provide increased supervision for her children, the need to supervise their access to phones and social media, and the need to behave as a parent rather than a friend to her children. However, based on her intellectual limitations, [respondent] remains unable to apply those concepts to new scenarios that might arise during parenting. [Respondent] lacks the ability to extrapolate things she may have learned to situations that had not yet presented themselves in caring for her children. In short, while [respondent] had gained some new concepts, her ability to exercise judgment had not improved.

18. During her third evaluation by Dr. Cappelletty in September 2019, and during her testimony in this [c]ourt, [respondent] was reluctant to acknowledge that her children were abused by Mr. Gortney. She repeatedly stated that she simply did not know what happened because she had not seen it. She was unwilling to believe what her children stated about the abuse and she did not demonstrate a desire to understand what her children had gone through.

19. During her evaluations and during these proceedings, [respondent] has not acknowledged any personal responsibility for her children's placement in foster care. She continues to blame her family for calling in CPS reports, to blame [DSS] for Mr. Gortney being in her home, and even to blame her own children.

20. Upon learning of [Lucy's] and [Ingrid's] statements that

Mr. Gortney had acted in sexually inappropriate ways toward them, [respondent] did contact [DSS]. After the children's most recent removal, [respondent] did report when one of the children had an unauthorized phone. Thus, [respondent] has perhaps learned how to react to the sexual abuse of her children; however, there is no evidence that she has learned sufficient skills to proactively protect her children from harm.

21. [Respondent] has demonstrated a long-term pattern of difficulty believing that her children have been abused. She has expressed disbelief that her oldest daughter was abused by her father. She has repeatedly stated her disbelief that her now deceased husband abused anyone, despite his own admission of guilt and his convictions for abusing multiple individuals. When [Lucy] and [Ingrid] were interviewed following the abuse by Mr. Gortney, [respondent] refused to hear the results of those interviews. She has demonstrated a long-term pattern of denial and of failure to believe her own children over the men that abuse them.

22. Given their history of abuse, [Lucy] and [Ingrid] are likely to display sexualized behaviors and to require an even greater level of parental competence, vigilance, and skill. [Respondent] is likely unable to provide the level of care and supervision her children need.

23. . . . During the time that [Lucy] and [Ingrid] resided with [respondent] and [Mr.] Gortney, [their older sister Sarah] visited the home. [Sarah] had concerns about Mr. Gortney because he smacked her on the butt and because [Lucy] and [Ingrid] told her that he had touched them. [Sarah] reported her concerns to [respondent] who told her that she didn't believe her.

24. In or about March 2020, [Sarah] met [respondent] for dinner at Denny's in Lincolnton, and [Mr.] Gortney was present with [respondent]. [Respondent's] continued association with Mr. Gortney, including having him at a dinner where her daughter [Sarah], who has previously

expressed concerns about him, is indicative of her failure to place the needs of her children above her own or to demonstrate an ability and willingness to protect [t]he children.

25. Despite her cooperation with services over a period of years, [respondent] has failed to take responsibility for her role in the abuse and neglect of her children. She has failed to demonstrate the ability to believe her children and to protect them from maltreatment.

. . . .

27. There is a significant likelihood that the minor children would again be abused or neglected if returned to the care of their mother.

¶ 14    The only finding respondent specifically challenges as not supported by any evidence is finding of fact seventeen. Respondent contends the portions of finding of fact seventeen providing that she lacks the ability to extrapolate and apply recently acquired skills to circumstances that arise in parenting the children is not supported by the evidence and is contradicted by finding of fact twenty. We agree. The trial court found in finding of fact twenty that "[u]pon learning of [Lucy's] and [Ingrid's] statements that Mr. Gortney had acted in sexually inappropriate ways toward them, [respondent] did contact [DSS,]" and "[a]fter the children's most recent removal, [respondent] did report when one of the children had an unauthorized phone." Thus, finding of fact twenty showed that respondent applied learned parenting concepts on at least two occasions. Accordingly, we disregard the challenged portions of finding of fact seventeen to the extent the finding implies respondent was unable to apply

anything she learned through her participation in services. *See In re J.M.*, 373 N.C. 352, 358 (2020) (disregarding factual findings not supported by the record).

¶ 15        Although respondent does not otherwise challenge the trial court's findings as unsupported by evidence, respondent does argue the trial court's findings concerning the impact of her cognitive limitations and dependent personality on her understanding of the causes and prevention of sexual abuse and her ability to keep Lucy and Ingrid safe are based on speculation and run counter to other evidence of her positive changes adduced at the termination hearing. She specifically identifies findings of fact fourteen, sixteen, seventeen, twenty, and twenty-two as speculative and counter to other evidence. Respondent's argument essentially asks this Court to reweigh the evidence and place greater weight on her own testimony and the testimony of her therapist regarding her progress in addressing her parenting issues.

¶ 16        It is the trial court's duty, however, to consider the evidence and pass upon the credibility of the witnesses, *see In re T.N.H.*, 372 N.C. at 411 (citing *In re D.L.W.*, 368 N.C. 835, 843 (2016)), and this Court will not reweigh the evidence. Here, the trial court's findings concerning the impediment that respondent's cognitive limitations and dependent personality posed to her in making significant parenting changes in order to protect Lucy and Ingrid from further harm are supported by the testimony of Dr. Cappelletty, who evaluated respondent three times between 2016 and 2019 with the specific purpose of assessing her capacity to parent and protect her children.

Dr. Cappelletty testified as an expert in clinical psychology about her conclusions from each assessment, including the impact of respondent's cognitive limitations and dependent personality, and the combination of the two, on her ability to learn and implement positive parenting behaviors. Dr. Cappelletty continued to express concern about respondent's ability to protect the children as of the termination hearing, testifying that while she believed respondent was better equipped to respond to abuse of the children after the fact, there was no indication that respondent was prepared to proactively prevent the children from being abused in the first place. She concluded there had been no significant change since she became involved in respondent's case, and the pattern of neglect was likely to continue. The challenged findings reflect Dr. Cappelletty's testimony; are supported by clear, cogent, and convincing evidence; and are binding on appeal. *See In re B.O.A.*, 372 N.C. at 379.

Additionally, we note that while any determination of a likelihood of future neglect is inevitably predictive in nature, the trial court's findings were not based on pure speculation. Not only are the findings supported by Dr. Cappelletty's testimony, but the findings were also validated by the pattern of past neglect of the children due, in part, to respondent's repeated failure to comprehend and protect the children from the risks of harm to which she exposed them, despite her cooperation with services intended to address her parenting deficiencies.

Respondent also asserts challenges to the trial court's findings concerning her

doubts or disbelief that her children have been abused in findings of fact twelve, fifteen, eighteen, twenty-one, and twenty-three; her continued association with Mr. Gortney as recent as March 2020, which the court found "indicative of her failure to place the needs of her children above her own or to demonstrate an ability and willingness to protect [t]he children" in finding of fact twenty-four; and her refusal to acknowledge her role in and accept responsibility for the adjudications of neglect in findings of fact nineteen and twenty-five. Again, respondent does not argue the findings are not supported by evidence. She instead attempts to rationalize her beliefs and behaviors. She asserts that she had reasons to doubt the allegations of sexual abuse; that she disputed the portion of Sarah's testimony from the termination hearing that respondent brought Mr. Gortney to dinner in early 2020 and denied that it ever happened, yet respondent claimed even if she did have dinner with Mr. Gortney that it did not violate the court order that he not have contact with Lucy or Ingrid; that DSS and the court were to blame for her relationship with Mr. Gortney and the most recent adjudication of neglect; and that her denial of responsibility was fair and reasonable because the questions presented to her at the termination hearing were confusing, and the record does not indicate the sexual abuse of her children was the result of anything she did or did not do.

¶ 19        Respondent's assertions here tend to confirm the trial court's findings that she continues to doubt that Lucy and Ingrid were abused and fails to accept any

responsibility. However, for purposes of our review of the challenged findings, it is sufficient that the findings are supported by Dr. Cappelletty's testimony, Sarah's testimony, and respondent's own testimony at the termination hearing, as well as the record evidence. The findings are therefore binding on appeal. *See In re B.O.A.*, 372 N.C. at 379.

¶ 20        Upon review of the relevant findings, we believe the findings show a pattern of neglect that is likely to be repeated if Lucy and Ingrid are returned to respondent's care. Specifically, the undisputed findings detail three prior adjudications of neglect that resulted from respondent's exposure of the children to men with histories of child sexual abuse and her failure to protect the children in their own home, with the second and third adjudications occurring after respondent began cooperating with services to address parenting concerns. The findings and evidence also show that respondent's cognitive limitations and dependent personality continue to be a concern related to her ability to appropriately supervise the children and protect them from future abuse. Furthermore, respondent continues to express doubt that the children were abused and fails to acknowledge her own role in their neglect. The combination of these findings supports the trial court's determination that there is a substantial likelihood of future neglect if Lucy and Ingrid are returned to respondent's care. In turn, the past adjudications of neglect coupled with the determination that there was a likelihood of future neglect support the trial court's adjudication of the existence of

grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 21     Because "an adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights[,]" *In re E.H.P.*, 372 N.C. 388, 395 (2019), we need not address respondent's arguments as to grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(2) and (6). Furthermore, because respondent has not challenged the trial court's determination that termination of her parental rights was in Lucy's and Ingrid's best interests, we affirm the termination order.

AFFIRMED.